UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO (DENVER)

No. 1:24-cr-320-RMR

UNITED STATES OF AMERICA,

                    Plaintiff,

vs.

ASHLEY DANIELLE BLACKCLOUD,

                    Defendant.

## MOTION FOR JUDGMENT OF ACQUITTAL OR FOR A NEW TRIAL AND BRIEF IN SUPPORT

I.    <u>Introduction</u>

Ashley Blackcloud moves the Court to enter judgment of acquittal or for a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.

Trial began on May 19, 2025 and concluded on May 23, 2025.  References to the trial transcript will be made by volume and page number.  At the close of the government's case, Blackcloud moved for a judgment of acquittal.  Vol. 4, pp. 698-700.  The Court denied the motion.  Blackcloud did not renew the motion during the trial.  The jury returned guilty verdicts on both counts of the Indictment, Conspiracy contrary18 U.S.C. § 371, and Making a Threat by Fire, contrary to 18 U.S.C. § 844(e).

The Court heard the evidence at trial and will recall that the charges related to the burning of a cross in front a defaced campaign sign of a Colorado Springs

mayoral candidate and dissemination of a video of the cross burning via email and social media. We are challenging the sufficiency and the weight of the evidence as to the issue of a true threat, so the factual description will cover a lot of areas. We are attempting to be conclusory in undisputed areas, including, that we are not disputing the evidence established Blackcloud participated in the cross-burning and in the dissemination of the "concerned citizen" email that contained the video of the cross burning. Blackcloud did not dispute this at trial. We would also note that the sufficiency and great weight arguments are framed in the context of the instructions actually given to the jury, not to the instructions we asked be given to the jury. The Court has noted our continuing objection to the instructions given.

II.    <u>Statement of Facts</u>

The government proofs largely consisted of surveillance videos and forensic evidence that tended to show that Blackcloud and Deanna West staged the cross burning at a vacant intersection in a commercial area of Colorado Springs on April 23, 2023 at about 3:15 a.m. There was no evidence that anyone saw the cross as it burned, and it produced a small flame that burned out quickly. It was done in a public area surrounded by closed businesses, not on someone's lawn or home or school, and it was done in the middle of the night when no one saw it. Vol. 3, p. 432. West took a photo and video of the cross burning because the point was to get a video/photo to disseminate it on social media and through the media.

West testified that she worked at Family Flavors the Slide World Broadcasting Network (The Slide) in exchange for room and board. She worked for Derrick Bernard and worked with Blackcloud. West said she, Blackcloud and Bernard did

the cross burning together. She said it was Bernard's idea to burn the cross and he directed West and Blackcloud as to what to do. However, West said Bernard did not get out of the car to participate in the cross-burning. West said she and Blackcloud did that part. West said Blackcloud lit the cross on fire but West took the video of it with her phone. West was unsure who defaced the campaign sign. Vol. 3, p. 438.

West said that Bernard had a business relationship with Yemi Mobolade. Vol. 3, p. 325. Moboalde was a black candidate running for mayor of Colorado Springs against a white candidate. Bernard and Blackcloud supported Mobolade's candidacy, and he was the first black person to run for mayor in Colorado Springs, a city that had a history of racism. West said that Bernard and Blackcloud were community activists. She said that Blackcloud was not KKK or a white supremacist – she was the opposite. Vol. 3, p. 429.

West said that Bernard wanted to get some media "traction" with the cross-burning video, so he directed West and Blackcloud to compose an email to send out to the media with the video. Vol. 3, p. 351. West created a Gmail account using a fake name. Vol. 3, p. 355. She did so using a publicly accessible Wi-Fi connection at a WalMart store. West created the fake email account and used public Wi-Fi because Bernard did not want anyone to trace the email back to The Slide. Vol. 3, p. 362. West researched on the internet to get ideas about how to write such an email and to get quotes to help draft it. Vol. 3, p. 440. West "copied and pasted" language from an article she found online called "Hate in Elections" into the email. Vol. 3, p. 441. She said Blackcloud helped her with this while they were in the WalMart parking lot but

the Google searches on her cellphone told a different story, indicating that West did the searches prior to them being in the WalMart parking lot.  Vol. 3, p. 445.

With Blackcloud's guidance as to email addresses of various media outlets, West said she created a "concerned citizen" email with the video addressed to local media outlets and politicians.  Vol. 3, p. 314.  The email was admitted at trial as Exhibit 1 and is attached here as Exhibit 1.  West said the point of the video and email was to show that there is still racism in Colorado Springs and to bring attention to it.  Vol. 3, p. 316.  The email went out at 9:01 p.m. on April 23, 2023.  Vol. 3, p. 355. The email suggested that the followers of Mobolade's opponent, Wayne Williams, were behind the cross-burning incident and that the Williams supporters were trying to deter people from voting.  The email contained false information about who did the cross-burning and why.   Vol. 3, pp. 357-358.  West said that the cross burning was not actually a hate crime, even though the email called it a hate crime.  Vol. 3, p. 359. Bernard was pleased with the email that went out and the story did get traction in the media.  Vol. 3, p. 369.

West said that the entire cross burning was meant to be a political statement, drawing attention to the existence of racism in Colorado Springs.  Vol. 3, p. 431.  The idea was to rally voters in support of Mobolade.  Vol. 4, pp. 431, 449.  The intent was not to actually threaten Mobolade: West said that none of them would ever do that and none of them had any reason to do that. *Id.* According to West, the intent was to get out the vote for Mobolade.  Vol. 3, pp. 440, 449.  West said the whole thing was a

publicity stunt, not a hate crime.  Vol. 3, p. 446.  West said that the stunt was directed at the community, not one person in particular.  Vol. 3, p. 448.

But West agreed that in order for the stunt to get people out to vote for Mobolade, it had to "seem real."  Vol. 3, p. 449.  She said that if the community knew the video was a hoax, it probably would not have generated sympathy for Mobolade. Vol. 3, p. 450.  West said that it had to be "pushed out more aggressively for the community to take notice" so that the community would see that "danger is still out there, white supremacists or KKK groups are still active in going against the black community, period, and just making more of a motion of their efforts to put us down." Vol. 3, p. 450.

West said she believed that Mobolade would be upset when he saw the video. Vol. 3, p. 392.  For West, the burning cross would be a symbol of racism and black oppression, and she thought that sending such a message to Mobolade might make him feel "threatened and concerned and worried about how they continued in the campaign." Vol. 3, p. 392.

The remnants of the burned cross and defaced campaign sign were discovered by a passerby the morning after the cross burning.  Vol. 4, p. 639.  That person turned the items over to volunteers with the Mobolade campaign who later turned the items over to the police.  Vol. 4, p. 639.  None of those people called the police about the burned cross.

Yemi Mobolade described the general and run-off elections.  He kicked off his campaign officially on January 7, 2023; the general election was on April 4, 2023; the

run-off was on May 16, 2023; and he was sworn in as mayor on June 5, 2023. Mobolade said he is a people leader.  He said he had about 40 people on his core campaign team but also had hundreds of volunteers.  Vol. 1, pp. 35-36.  There was no central campaign office, they ran the campaign via Zoom meetings or by meeting in public places or people's homes.

At the time of the campaign, Mobolade knew Derrick Bernard as a local media personality interested in local politics, including the mayoral campaign.  Vol. 1, p. 37. He said Bernard operated a radio station and podcast.  Vol. 1, p. 38.  Mobolade knew The Slide to host community events, a radio station and podcasts.  Vol. 2, p. 105.  He and other politicians used The Slide as a platform to convey their messages.  *Id.*  In particular, Mobolade knew The Slide as being a hub for black leadership in Colorado Springs.  Vol. 2, p. 133.

Bernard and Mobolade communicated.  Communication between Bernard and Mobolade was primarily done over the phone or by messaging, but they met in person a few times at The Slide studios.  Vol. 1, p. 39.  Mobolade "absolutely" did not consider Bernard a friend and their communications were "never" personal, they were always about community issues.  *Id.*  Moboalde said that Bernard's speaking style was very cryptic and slangish, he often did not know what Bernard was trying to say.  *Id.*  But Mobolade did believe that Bernard and the radio station were supportive of his candidacy.  Vol. 2, pp. 137, 141.

Mobolade met Blackcloud at The Slide radio station when he was there doing podcasts on a couple of occasions.  Vol. 1, pp. 46, 107.  He later learned that she was in a relationship with Bernard.  Vol. 1, p. 46.

There were a number of different communications between Mobolade and Bernard that were discussed on the record.  There were several text/Facebook Messenger messages that were admitted in the lead up to the run-off and following it that showed that Bernard and Mobolade were communicating regularly.  This included a Facebook Messenger message from Bernard to Mobolade on April 13, 2023 that said: "I know it's crunch time, sir, but look, I spoke with some of my friends in other places and there's a plot amidst. I'm mobilizing my squadron in defense and for the final push. Black ops style, big brother. The Klan cannot be allowed to run this city again. We're with you, brother." Vol. 2, p. 75.  Mobolade said he did not know what this message referred to when he got it and he did not respond to it.  *Id.*  Mobolade said that he received this message from Bernard close in time to the May 16 run-off election and he was receiving a high volume of messages during this time.  *Id.*  But on April 16, 2023, Mobolade sent Bernard a message asking for help getting "to the finish line," meaning help him win the election  Vol. 2, pp. 77-78, 108.  Mobolade did not know how the run- off was going to turn out and wanted help from all volunteers and supporters.  Vol. 2, p. 108.

On Sunday morning, April 23, 2023, Mobolade learned that one of his campaign signs had been defaced with a racial slur.  Vol. 1, p. 47.  A video of a burning

cross in front of the defaced campaign sign was sent to his campaign with an email. *Id.* Mobolade recalled seeing the video but not the mail. *Id.*

The racial slur on the campaign sign was the word "nigger." Moboalde, who is from Nigeria originally, learned about the Ku Klux Klan (KKK) when he was in college in Indiana. He learned that the KKK was a white supremacist hate group. Vol. 1, p. 50. And he learned that a burning cross was a symbol of hate for the KKK. Vol. 1, pp. 50-51. Moboalde had never been personally subjected to any hate from the KKK. Vol. 2, p. 111.

When he saw the burning cross in front of his campaign sign, Mobolade said it felt very targeted towards him as a symbol of hate. *Id.* Mobolade said he felt "scared" for his family when he saw the video. Vol. 2, p. 65. He said that he and his wife knew they could be putting themselves in a vulnerable position by running for public office and they had taken some personal security measures at the outset of the campaign as a result. Vol. 2, p. 65. But this felt like a threat to their safety, and it was the thing they were concerned might happen "actually happening in real time." Vol. 2, p. 65.

Later on that Sunday, April 23, after learning of the cross burning on Sunday morning, Mobolade met with his core campaign team. Vol. 2, p. 94. Mobolade and his campaign team thought the cross burning might have been just stunt and that it was not real, but Mobolade said he was also concerned that it could be real. Vol. 2, p. 66. Some on his team were 99.9% sure it was a staged event and not real. Vol. 2, p. 149. The team thought it was a political trap. *Id.* Mobolade claimed that he did

not connect Bernard's text about the "Klan not being allowed to run the city again" to the cross burning.  Vol. 2, p. 111.

At that point, when his core team met on Sunday to discuss the cross-burning, neither Mobolade, nor anyone on his campaign team of which he was aware, had called the police about the cross burning.  Vol. 2, p. 94.  The police were not involved on Sunday.  *Id.*  The campaign wanted to keep the story of the cross burning under wraps because Mobolade and his team did not want any rioting in the city.  But by about 9:00 p.m. on Sunday, the "concerned citizen" email had been disseminated to the media and the story was hitting the news.  Vol. 2, p. 100.  When Mobolade was asked questions about it from friends and from the media, he said the cross burning might be a hoax and that they were not sure it was real.  Vol. 2, p. 150.  Mobolade said that the cross burning created a public relations crisis for his campaign.  Vol. 2, p. 159.

Mobolade personally called the chief of police, whom he knew from working in the community, on Monday, April 24.  This call to the chief of police was made a full day after the remnants of the burned cross were discovered.  Vol. 2, p. 101.  As far as Mobolade knew, his call to the chief of police was the first time anyone contacted the police about the cross burning.  *Id.*  The call with the police chief was a short call, Mobolade said.  Mobolade told the police chief that he did not want to make a big deal out of the incident.  Vol. 2, p. 102.  Mobolade learned that day when he talked to the police chief that there had been some graffiti on another one his campaign signs that said "Fuck Yemi."  This added to his concerns.  Vol. 2, pp. 67, 105.

Mobolade has three young children, all under the age of 11, and he was afraid to tell his wife about the cross-burning when it happened.  Vol. 2, pp. 66, 104-105. The Mobolade family lived in downtown Colorado Springs, a 5-to-10-minute drive from the office park area where the cross was found to have been burned.  Vol. 2, p. 103.  When Mobolade finally told his wife, she took some additional safety precautions such as no longer walking their kids to school, buying home safety devices and not letting the kids play outside alone.  *Id.*  Mobolade said all of this also caused him to increase security at his public events.  Vol. 2, p. 67.  Mobolade said that even though there was a belief early on that the cross burning was a hoax, from a security perspective he took it seriously because you "just don't know."  Vol. 2, p. 162.

The Colorado Springs Police Department initially investigated the cross-burning incident.  They had identified Blackcloud and Bernard as suspects by early to mid-May 2023 as a result of their review of surveillance videos in the area of the cross-burning.  Vol. 4, p. 631. The FBI soon after took over the investigation.  Early on during its involvement, the FBI referred to the cross burning as a "staged" event, meaning it was not a hate crime done by anyone from the KKK or white supremacists, but rather was done by supporters of Mobolade.  Vol. 4, pp. 636-637.

Later in the week after contacting the police chief, a detective from the Colorado Springs Police Department called Mobolade.  Mobolade gave the detective the contact information for the people on his campaign staff who were the first to find out about the cross burning.  But the police never came out to the Mobolade home. Vol. 2, p. 103.  And after the first month or so after the cross burning, Mobolade was

not asking for any updates from law enforcement about the status of the investigation.  Vol. 2, p. 119.

On April 26, 2023, a few days after Mobolade learned of the cross-burning incident, he and Bernard had several exchanges of texts/phone calls where they were trying to reach each other.  The two ended up talking on the phone for almost 6 minutes at 10:54 p.m. on April 26, 2023.  Vol. 2, pp. 81-82.  Mobolade said he could not remember what the two of them talked about on that night, but said that it could have been about the cross-burning, or maybe the campaign or maybe even a personal problem Bernard was having.  Vol. 2, pp. 82, 117-118.  But Mobolade said he was certain that Bernard did not tell Mobolade that he was responsible for the cross burning or that he expected any favors from Mobolade.  *Id.*  Mobolade said that if Bernard had said anything like that, he would have reported it to the police.  *Id.*  As Mobolade described it, he did not understand many of the messages Bernard sent him.  Vol. 2, pp. 83-85.  But Mobolade did acknowledge that he continued to message Bernard even after the run-off, including receiving congratulatory messages from Bernard.  *Id.*, p. 83.

Mobolade learned from the police chief that Bernard and Blackcloud were suspects in the cross burning.  Vol. 2, p. 111.  Mobolade could not remember when he learned about it.  He speculated that it was after he became mayor, but it could have been before he became mayor, and he believed they may have had multiple conversations about it. Vol. 2, p. 111.  Even though he learned Bernard was a suspect, he did not offer the police or FBI investigators any of the information above about his

communications or phone calls with Bernard until he was asked about it during FBI interviews 7 or 8 months after the cross burning. Vol. 2, p. 112. In fact, when first questioned about his communications with Bernard by the FBI in January 2024, Mobolade claimed to be "120% certain" that he did not have any phone calls with Bernard after the cross-burning incident. Vol. 2, p. 116. Mobolade recognized that this statement was contradicted by the phone records showing his 6-minute call with Mobolade on April 26. *Id.* Again, Mobolade reiterated that he was just really busy during the campaign and could not remember what he and Bernard talked about. *Id.*

The FBI contacted Mobolade in January 2024 and interviewed him a few times. Mobolade gave them screenshots of his messages with Bernard. Mobolade was prepared to hand over his cell phone so the FBI could analyze it, but the FBI decided to get his records a different way. Though Mobolade was unaware of it at the time, the FBI obtained search warrants and other legal process to get Mobolade's phone records and Facebook records. Vol. 4, p. 644. Mobolade's actions came within the scope of the criminal investigation the FBI was conducting and the FBI believed Mobolade may have intentionally lied to them about his contacts with Bernard around the time of the cross burning. Vol. 4, p. 644.

Abbey Mobolade, the candidate's wife, said that she assumed the cross burning was a death threat and took a lot of measures to promote the family's safety. Vol. 2, p. 164. She said that her husband was distressed and his voice was shaky when he told her about the incident. Vol. 2, p. 164-165. She said that learning about graffiti on another one of his signs elsewhere in the city made all of it more distressing. Vol.

2, p. 170.  Mrs. Vol. 2, pp. 170-171.  The police never came to her house as part of the investigation into the cross burning.  Mrs. Mobolade did not know until much later, close to the time her husband was being interviewed by the FBI in January 2024, that law enforcement had identified suspects and her husband had communications with one of the suspects.  Vol. 2, pp. 171-173.  Mrs. Mobolade also did not know that her husband was being criminally investigated for lying to the FBI in connection with the cross-burning.  *Id.*

The story of the cross burning died down pretty quickly and there was no news about it for about 18 months.  Then, in December 2024, West, Blackcloud and Bernard were indicted and the story was back in the news.  Mobolade was frustrated because he was getting bad press around this time and some people were saying that Mobolade himself had been arrested by the FBI.  Vol. 2, p. 123.  Mobolade made a public statement proclaiming himself to be the victim of the cross-burning crime not a suspect.  However, this was inaccurate because the FBI had been investigating Mobolade for the commission of crimes.  Mobolade claimed to be unaware of this, despite having received a letter that said as much and having a lawyer advise him.  The United States Attorney's office sent him and his lawyer a letter dated December 3, 2024 stating that his conduct was within the scope of the investigation involving a cross burning, that principles of federal prosecution resulted in the government closing its investigation as to him, but that the letter was not a "clean bill of health" or an exoneration.  Exhibit GG (attached but also admitted at trial).  Nevertheless, Mobolade insisted that he was just a victim and that he was cooperating with police.

Vol. 2, p. 124.  The FBI has not been able to conclude, one way or another to this day, whether Moboalde was intentionally deceiving the FBI in his interviews.  Vol. 4, p. 692.

The FBI was able to retrieve text messages from Blackcloud and Bernard's phones on May 16, 2023 that suggested that Bernard was expecting to get favors from Mobolade in the form of jobs with the City of Colorado Springs following Mobolade's run-off election victory.  Vol. 4, pp. 594-596.

The FBI interviewed Blackcloud on May 23, 2023.  The Colorado Springs Police Department was conducting a search warrant at her residence and the FBI used it as an opportunity to try to interview her.   Blackcloud repeatedly denied any involvement in the cross-burning but did say that it made her fearful and that she was upset by it.  Vol. 4, p. 621.  Blackcloud said she shared news reports with the cross-burning video on her personal social media feed.  She said Mobolade was a friend and that she supported him.  Vol. 4, p. 650.  Blackcloud did not testify at trial.

Bernard did testify at trial.  Bernard testified about his work at The Slide.  He said he became politically active and acquainted with local politicians through his work.  Bernard testified that he had been involved in the past in other political campaigns with defacing campaign signs as a tactic to help/hurt particular politicians.  Vol. 4, pp. 714-716.   Bernard said that the same people he had been involved with in past campaigns wanted him to help Mobolade's campaign.  Bernard said that the cross burning was "a strategic move to ensure that Yemi got elected, point blank, period.  There's no getting around it.  There were no threats.  Yemi

himself, he's aware.  He made sure that no investigation followed.  Those calls that were made, those were guarantees of this situation."  Vol. 4, p. 717.  Bernard elaborated that he hoped to get grants for his non-profit, The Slide, by helping the Mobolade campaign.  Vol. 4, p. 147.  He described himself as a member of a nonprofit organization "that put on political theater to ensure that voters came out."  Vol. 4, p. 725.

Bernard denied that he was present at the time the cross was burned or that he knew any details or specifics about it prior to it happening.  But he admitted that he agreed to push the video out in the media.  Vol. 4, pp. 725-727.  And he agreed that even though the intent behind it was not that anybody feel actually threatened – Mobolade was in on it, he said – that it was designed to make it seem as though somebody else was threatening Mobolade because that was the only way to generate sympathy for his campaign.  Vol. 4, p. 729.  Bernard said that other people thought it was a real threat but Mobolade did not.  Vol. 4, pp. 730-731.  Bernard said he spread the word about the cross burning happening, even though he knew it was a hoax, to spread outrage in order to gain sympathy votes for Mobolade.  Vol. 4, p. 731.

The jury was instructed on the law, the elements of the charged offenses and the definition of a true threat, including that the jury was told that "the government must prove beyond a reasonable doubt that the defendant willfully made a threat to Mr. Mobolade, or maliciously conveyed false information about a threat to Mr. Mobolade knowing that the information was false, and meant the communication not as political hyperbole or political theater but as a statement conveying a real

possibility that violence to Mr. Mobolade will follow."  Jury Instruction, Doc. 194.  A true threat was a necessary element for both counts.

The jury was also instructed that for both counts, it was necessary to prove the third element of the § 844(e) instruction, that "the threat or false information about a threat concerned an attempt or alleged attempt being made, or to be made, to kill, injure, or intimidate Yemi Mobolade by means of fire."  Jury Instruction, Doc. 194.

The government agreed that Blackcloud and Bernard were supporters of Mobolade but said that even if they did not actually intend to threaten Mobolade, they wanted people to believe it was a threat to Mobolade because "if they didn't, no one would have acted the way they wanted."  Vol. 4, p. 792.  It said: "[h]ow was this supposed to mobilize supporters?  By making them think that the candidate was being threatened, and that everyone should rush to his defense.  It only worked if everyone actually thought they meant this." *Id.*

III.    Applicable Law

Rule 29 of the Federal Rules of Criminal Procedure directs courts to enter a judgment of acquittal if the evidence presented at trial is insufficient to support the conviction.  That is, even after viewing the evidence in the light most favorable to the prosecution, no rational factfinder could have found the defendant guilty beyond a reasonable doubt. *Tibbs v. Florida*, 457 U.S. 31, 37-38 (1982); *Jackson v. Virginia*, 443 U.S. 307, 317-319 (1979).  The Court's role under Rule 29 is to determine whether the evidence, if believed, would establish each element of the crime. *United States v. Delgado-Uribe*, 363 F.3d 1077, 1087 (10th Cir. 2004).  The Court is permitted to give

16

the prosecution the benefit of reasonable inferences. The court should not find that there is enough evidence to support a conviction, however, if a conviction can only be "obtained by piling inference upon inference." *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998). Inferences that are piled upon each other are not reasonable. *United States v. Summers*, 414 F.3d 1287, 1294-95 (10th Cir. 2005).

Rule 33 of the Federal Rules of Criminal Procedure provides that the Court may vacate a guilty verdict and grant a new trial if "the interest of justice of requires." Fed. R. Crim. P. 33(a). The Court has discretion in ruling on the motion and may weigh the evidence and assess witness credibility. *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999). The standards for granting a new trial are not as strict as the standards for granting judgment of acquittal. The court should grant a motion for a new trial if, "after weighing the evidence and the credibility of the witnesses, the court determines that 'the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.'" *United States v. Gabaldon*, 91 F.3d 91, 93-94 (10th Cir. 1996) (quoting *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994)).

The Court's discretion to grant a new trial under Rule 33 is broader than its discretion to order an acquittal under Rule 29. *Tibbs,* 457 U.S. at 37. In contrast to Rule 29, under Rule 33 the Court does not have to view the evidence in the light most favorable to the government and may instead weigh the evidence in a manner that more accurately describes the proceedings. *Id.* at 37-38.

IV.    <u>Argument</u>

    A. *There was insufficient evidence of a true threat.*

"[T]he government must prove beyond a reasonable doubt that the defendant willfully made a threat to Mr. Mobolade, or maliciously conveyed false information about a threat to Mr. Mobolade knowing that the information was false, and meant the communication not as political hyperbole or political theater but as a statement conveying a real possibility that violence to Mr. Mobolade will follow."

There was no evidence that Blackcloud meant the communication – the cross-burning – as a statement conveying to Mobolade a real possibility that violence to Mobolade will follow. There was direct evidence about this from both West and Bernard. West said that the entire cross burning was meant to be a political statement to draw attention to the existence of racism in Colorado Spring. She said the idea was to rally voters in support of Mobolade. West said the intent was not to actually threaten Mobolade it was to get out the vote for Mobolade. West said the whole thing was a publicity stunt, not a hate crime. There was no evidence to the contrary.

Bernard took it even further. He said Mobolade was in on it and that there were no threats to Mobolade, it was a political stunt.

Blackcloud was also a supporter of Mobolade and wanted him to win. She considered Mobolade a friend. She was not a white supremacist or KKK. No reasonable inference could be drawn from the proofs in this case that her intention was different from West's or Bernard's and both of them spoke on behalf of the group: it was a stunt not meant to threaten but rally support.

18

The FBI called the cross-burning "staged," meaning it was not a hate crime committed by white supremacists or the KKK.  The government conceded they were supporters of Mobolade.

The government's theory was not that Blackcloud, West and Bernard actually meant to threaten Mobolade.  Its theory was that they wanted the community to *think* it was a real threat to Mobolade.  Both West and Bernard agreed that in order for the video of the cross-burning to mobilize support for Mobolade, it had to appear real to the community.   This is obvious.  But this does not amount to sufficient evidence of a true threat under the definition given to the jury: that Blackcloud "meant the communication not as political hyperbole or political theater but as a statement conveying a real possibility that violence to Mr. Mobolade will follow."   The "communication" made, i.e. the cross-burning, had to be the "threat to Mr. Mobolade" or the "false information about a threat to Mr. Mobolade."  How the cross-burning was meant to be perceived by the community to mobilize support is not part of the definition of a true threat. It is what the cross-burning was meant to convey to Mobolade, as the "victim" of the crime, which constitutes a true threat, or not.   The Court should enter judgment of acquittal because no reasonable juror could have found beyond a reasonable doubt that this was a threat directed at Mobolade that was meant to make him feel threatened: it was a stunt directed at the community.

> B. *There was insufficient evidence that the false information about a threat concerned an attempt being made, or to be made, to kill, injure, or intimidate Yemi Mobolade by means of fire.*

The "false information about a threat" was information contained in the concerned citizen email about who sent the email, who was behind the cross burning and why. But the threat itself, the cross burning, had already occurred. The concerned citizen email was sent at 9:01 p.m. on April 23, 2023, and the cross was burned at about 3:15 a.m. on April 23, 2023. Thus, the false information was about something that happened in the past. It was not false information about a threat "being made" currently or "to be made" in the future. Because the threat happened in the past, the elements of "being made, or to be made" were not met. The Court should enter judgment of acquittal.

### C. The convictions were against the great weight of the evidence and resulted in a miscarriage of justice.

Under Rule 33 the Court should sit as a thirteenth juror and consider the credibility of witnesses and the weight of the evidence to ensure there is not a miscarriage of justice. In doing so here, Blackcloud asks the Court to consider the above arguments about sufficiency of the evidence under Rule 29. But since the Court can use its own judgment to weigh and evaluate the evidence, there are some additional points it may want to consider.

First, the Court should consider the credibility of Mobolade. Although the Court cannot do that under Rule 29, it can under Rule 33. The Court more so than a jury has experience with the gravity and significance of being the subject of a federal criminal investigation and the amount of probable cause that Mobolade was involved in a crime that was necessary to support search warrants for his personal communications. Mobolade claimed not to understand any of this, despite the

assistance of counsel, just like he claimed not to understand Bernard's communications, communications that should have been red flags to him if he really was totally in the dark about the cross burning all along. Mobolade said he was scared by the cross burning video but he did not read the email, did not call the chief of police for a full day after learning about the cross burning, did not tell police about his substantial contacts with Bernard even after learning early on that he was a suspect and his team was "99.9%" sure the whole thing was a political hoax. As the Court considers Mobolade's testimony that this was even a threat, much less a *true* threat, it can consider his credibility.

Second, the government's theory was that Blackcloud wanted the community to *think* it was a real threat to Mobolade and therefore, constitutes a true threat. Regardless of how the jury was instructed and whether based on the instructions any reasonable jury could find guilt, it is not a legally supportable theory. We can find no authority for the proposition that creating the false illusion of a threat to the community, rather than to the actual named victim, can be a true threat. Without meaning for the victim to feel threatened, this is exactly the type of political theater that is protected under the First Amendment.

Moreover, the cross-burning, i.e. the allegedly threatening communication, was real. The government theory was that it was fake. But it was not. A cross was burned. That happened. What was fake about it was the meaning behind it. It is true that the email that was disseminated contained false information. But the

charge was threat by fire, or maliciously false information about a threat by fire; the charge was not threat by email.

Count Two, and the object of the Conspiracy charged in Count One, was a violation of § 844(e). As noted in more detail in the previously decided Motion to Dismiss, § 844(e) was enacted in 1970 to deal with bomb threats. The Anti-Arson Act of 1982 amended § 844(e) to add the word "fire." Thus, § 844(e) is now aimed at arson threats and bomb threats, whether the threats are real or fake. In our circuit, § 844(e) has been used to prosecute bomb threats, real or fake. Cross burning cases in this circuit have not utilized § 844(e) and we have not found a single federal cross burning case where § 844(e) is the charged offense. Using § 844(e) to prosecute a cross burning is novel. The legislative history of the statute shows that a cross burning was not intended to fall under the proscription of § 844(e). A cross burning is not a bomb threat nor is it an arson threat. It is a symbolic burning of one's own property.

Fake threats, such as fake bomb threats, are threats that can be prosecuted under § 844(e)'s "false information" clause if they are "true threats" intended to threaten or cause fear, regardless of whether the defendant intends to carry out the bomb threat. But in those cases where there is a fake threat, what is fake about the threat is that there never will be a bomb or an arson. The threats are fake because the defendant intends to threaten or cause fear but does not intend to carry out the threatened activity.

But in this case, the fire event did happen. A cross was burned. What makes this cross burning a hoax is not that the activity, i.e. the cross burning, was never

going to happen.  It is a hoax because it was not intended as a threat.  It was staged as a political publicity stunt. The false information was in an email after the fact. What was false about it was who sent the email and who was behind the cross-burning and why, not whether the cross-burning would actually happen. Indeed, it had already happened.   Allowing the false illusion of a threat theory to support conviction here would be unprecedented and a miscarriage of justice.  We ask the Court to order a new trial if it does not enter judgment of acquittal.

Respectfully Submitted,

BRITT M. COBB, LAW OFFICES
Dated: July 7, 2025                    Attorney for Defendant Blackcloud

s/      *Britt M. Cobb*
_____
Britt M. Cobb (30099)
3570 E. 12th Avenue, Suite 200, #142
Denver, CO 80206
britt@brittmcobb.com
(303) 351-1628