UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO (DENVER)

No. 1:24-cr-320-RMR

UNITED STATES OF AMERICA,

                                           Plaintiff,

vs.

ASHLEY DANIELLE BLACKCLOUD,

                                           Defendant.

## MOTION FOR DOWNWARD VARIANCE AND BRIEF IN SUPPORT

I.        <u>Introduction</u>

Ashley Blackcloud, a.k.a. Trinity Blackcloud, moves for a downward variance from the advisory guideline range under 18 U.S.C. § 3553(a) and *Rita v. United States*, 551 U.S. 338 (2007). She requests the Court to consider the following information in support of her motion for variance at her sentencing set to take place on January 15, 2026 at 3:00 p.m. She asks the Court to find that a sentence that does not involve a further custodial term is sufficient but not greater than necessary for her because she already has 5 days of presentence confinement, has excelled on bond, she is respected in her community as a humanitarian, has a good work ethic and there are features of her case that make a guideline sentence fall outside of the heartland. She asks the Court to impose a sentence to probation with credit for 5 days of credit for time already served or with home detention as a condition.

II. <u>Sentencing Factors</u>

As the Court is well-aware, the relevant sentencing factors are found in 18 U.S.C. § 3553, and the standard is that a sentence be "sufficient, but not greater than necessary," to comply with the multiple purposes of sentencing found in § 3553(a)(2). Some of these purposes are to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment; to afford adequate deterrence; and to protect the public. 18 U.S.C. § 3553(a)(2). The relevant factors to consider are broadly described in § 3553 as being the nature and circumstances of the offense, and the history and characteristics of the defendant.

A. *The Defendant*

Ms. Blackcloud has submitted letters of support through the probation officer per D.C.Colo.LCrR 32.1(e) from over a dozen friends and co-workers. We refer to the contents of those letters to provide the Court perspective on who Ms. Blackcloud is as a person. We have also submitted a Mitigation Report by Carolin Kaplan, MSW, LCSW that she offers to the Court in support of the contents of this motion.[1]

Ms. Blackcloud is 41 years old. She is the mother of a 19-year-old son who is autistic but mostly self-sufficient. Ms. Blackcloud has stable housing and lives in close proximity to her son. Ms. Blackcloud is her son's primary support and she needs to be nearby when he needs her help. Exhibit A, p. 8.

---

[1] We are submitting both sets of documents under Restricted Access for the Court's and government's more immediate ease of reference since the probation officer is not required to file them until 7 days prior to sentencing. The Mitigation Report is Exhibit A and the letters, collectively, are exhibit B.

Ms. Blackcloud has a good, consistent work history and has juggled the demands of more than one job at a time while this case has been pending. The letters from her co-workers/ describe Ms. Blackcloud as a stellar employee with an outgoing and professional attitude towards work. Exhibit B; Exhibit A, p. 8. They say she is passionate, skilled, hardworking and has an efficient work ethic. They describe that she enjoys teamwork and leads by example.

Ms. Blackcloud's friends repeatedly describe her as compassionate, empathetic, caring and loyal. Exhibit B. Several of the letter writers describe specific acts of selfless kindness and help that Ms. Blackcloud has offered them during the course of their relationship. They describe that Ms. Blackcloud is a volunteer and advocate for the homeless and other community organizations. They say that Ms. Blackcloud is a real asset to the Colorado Springs community and that her focus is on uplifting others. She volunteers in the community regularly. They recognize the error in her actions here but agree that she surely did not mean to hurt anyone because that is not who she is. And Ms. Blackcloud's closest friend says that Ms. Blackcloud understands the seriousness of the situation she created with her actions in this case, that Ms. Blackcloud is remorseful and committed to healing and contributing to society as part of her accountability and growth.

A notable feature of Ms. Blackcloud's background is the amount of trauma that she has survived. We will not go into those details in this unrestricted filing. But what strikes as remarkable about Ms. Blackcloud is that she has not let that background consume her and derail her. Instead, she has sought to uplift others,

3

stand up to bullies and advocate for social justice rather than getting dragged down into bad behaviors such as substance abuse, abuse of others or a life of crime. As is detailed extensively in Exhibit A, Ms. Blackcloud has instead take up humanitarian work in the community to give her an identity beyond her past struggles. By lifting up others, she lifts herself. Exhibit A, pp. 5-8. This type of reaction to a history of complex trauma and toxic stress is documented in the literature, as detailed in Exhibit A, and can serve people well as they navigate life as productive adults, like Ms. Blackcloud has done.

The offense conduct in this case occurred in April/May 2023. Ms. Blackcloud was prosecuted in November 2024. Her only prior adult criminal conviction was for a misdemeanor assault that occurred in 2020. She discharged probation successfully in that case.

A word about the 2020 assault case, which is listed in ¶ 45 of Initial PSR. Doc. 225. That case involved Ms. Blackcloud and her then 15-year-old son defending themselves against others. Ms. Blackcloud was prosecuted in the state district court and her son was prosecuted as a juvenile. Her case took a long time to make its way through the legal system and it was a very stressful time for Ms. Blackcloud, particularly because of the toll it took on her son. Ms. Blackcloud's case was tried to a jury, which was unable to reach a verdict. Ms. Blackcloud eventually pled guilty to the misdemeanor assault with community service and unsupervised probation because the entire process had become re-traumatizing to her given her childhood and adolescent history. It was during her healing from that incident that she became

4

affiliated with Family Flavors the Slide and immersed herself in community work. Exhibit A, p. 6.

Ms. Blackcloud spent five days in custody prior to being released on bond. She was arrested on the federal warrant on Friday, November 8, 2024 and was not released until Tuesday, November 12, 2024. There were weather related delays getting her to Denver from Colorado Springs on November 8 so the arresting agents could not get her in front of a judge before the three-day Veteran's Day weekend. As Magistrate Judge Timothy O'Hara noted when she finally made her first appearance on November 12, it's "not supposed to happen like that." She was released on bond with conditions that day and has been faithful to the conditions.

The charges in this case have not only put her in legal peril, but they have caused her to lose her sense of identity, one that had grown increasingly tied to her community and humanitarian work. Losing that anchor has resulted in a resurgence of the mental health symptoms related to her past trauma but to her credit, she is handling this as aggressively and responsibly as she can. Exhibit A, pp. 7-8.

B.   *The Offense*

The Court is well aware of the details of the offense having presided over the 4-day jury trial and having before it consideration of Ms. Blackcloud's Motion for Judgment of Acquittal or for a New Trial that recites the trial evidence in some detail. Ms. Blackcloud helped her co-defendant, Derrick Bernard, execute a plan to rally support for mayoral candidate Yemi Mobolade by taking a video of a burning a cross in front of a campaign sign with a racial epithet painted on it and disseminating the

5

video on social media as a political stunt. Co-defendant Deanna West, who also helped, testified at trial that the idea was to rally voters in support of Mobolade. Trial Vol. 4, pp. 431, 449. The intent was not to actually threaten Mobolade: West said that none of the defendants would ever do that and none of them had any reason to do that. *Id.* According to West, the intent was to get out the vote for Mobolade. Trial, Vol. 3, pp. 440, 449. West said the whole thing was a publicity stunt, not a hate crime. Trial Vol. 3, p. 446. West said that the stunt was directed at the community, not one person in particular. Trial Vol. 3, p. 448. The FBI determined early on that the cross burning was "staged," meaning it was done by supporters of Mobolade, that it was not motivated by hate and not done by the KKK or white supremacists. Trial Vol. 4, pp. 637-638.

Further, according to West, the whole thing was Bernard's idea and plan. West testified that Bernard was "lead on everything, director of how things were going to play out" and Blackcloud's role "was to help and assist." Trial Vol. 3, p. 318. West described that Blackcloud and she were involved in executing the plan but that it was "mainly Phoenixx, but through Trinity" who instructed West on what to do. Trial Vol. 3, pp. 334, 407. It was "Phoenixx" who talked to them about the plan to push the images out on social media and West and Blackcloud worked together to execute Bernard's plan. Trial Vol. 3, pp. 350, 368, 370. It was Bernard who told Blackcloud that "I got a plan" and who told Mobolade that he was "mobilizing my squadron in defense and for the final push…." Initial PSR, Doc. 225, ¶ 8. And the PSR concludes that Blackcloud was a follower of Bernard's and helped Bernard, but that she was not

6

the mastermind of the incident.

Bernard testified at trial that he had been involved in political stunts like this in the past and that Mobolade was in on this one. Ms. Blackcloud did not testify at trial and did not contest that she was involved in the cross burning and social media postings. Her argument to the jury was simple: this was not a "true threat" and was protected by the First Amendment because she did not intend to make Mobolade feel threatened; to the contrary, the intention was to rally voter support for him.

As noted above, Ms. Blackcloud's closest friend attests that Ms. Blackcloud understands the seriousness of the situation she created with her actions in this case, but that Ms. Blackcloud is remorseful and committed to healing and contributing to society as part of her accountability and growth.

    C.    *The Guidelines*

We have reviewed the initial presentence report (PSR) and there are outstanding objections to the guideline calculations: to the U.S.S.G § 3A1.1 "hate crime" enhancement and to the non-application of the U.S.S.G. § 3E1.1 acceptance of responsibility adjustment. The PSR calculates the advisory guideline range to be 18 to 24 months imprisonment based on a Total Offense Level of 15 and a Criminal History Category of I. If the Court sustains our guideline objections, the advisory guideline range would be 6 to 12 months of imprisonment in Zone B of the Sentencing Table based on a Total Offense Level of 10 and a Criminal History Category of I. In Zone B, even under the guidelines, alternatives to incarceration such as home detention are available.

    D.    *Variance*

The Court may, of course, vary from the guidelines based on its evaluation of the § 3553(a) factors and also, if the Court finds a particular case "outside the heartland" to which the Commission intends the guidelines to apply. *See, e.g. Rita v. United States*, 551 U.S. 338 (2007). In this case, we ask the Court to vary downward not only based on the § 3553(a) factors, but also because the circumstances of this case as to Ms. Blackcloud cause it to fall outside of the heartland of the guidelines.

For starters, if the Court determines that the "hate crime" enhancement in § 3A1.1(a) technically applies, its application overstates the severity of the offense conduct and causes the case to fall outside the heartland because it is widely agreed that this was not a hate crime. West testified at trial that the cross burning and "concerned citizen" email were meant to be a political statement, drawing attention to the existence of racism in Colorado Springs. Trial Vol. 3, p. 431. Again, West testified that the idea was to rally voters in support of Mobolade. Trial Vol. 4, pp. 431, 449. The intent was not to actually threaten Mobolade. *Id.* The intent was to get out the vote for Mobolade. Trial, Vol. 3, pp. 440, 449. West said the whole thing was a publicity stunt, not a hate crime. Trial Vol. 3, p. 446. West said that the stunt was directed at the community, not one person in particular. Trial Vol. 3, p. 448. The FBI determined early on that the cross burning was "staged," meaning it was done by supporters of Mobolade., that it was not motivated by hate and not done by the KKK or white supremacists. Trial Vol. 4, pp. 637-638. This is not like the defendants in *United States v. Woodlee,* 136 F.3d 1399 (10th Cir. 1998) who racially taunted

8

several black victims before chasing them down in a car and shooting them. It is a far cry from that scenario where the § 3A1.1 enhancement applied. Variance is warranted, particularly if § 3A1.1 applies, because this was not a hate crime.

Similarly, if the Court determines that the acceptance of responsibility reduction does not apply, it should vary downward to recognize that Ms. Blackcloud did not contest her factual involvement in the scheme, only her legal innocence. It is important to our legal system that defendants be allowed to assert constitutional defenses based on First Amendment protections without being punished at sentencing. Variance would encourage defendants to use juries to check the government when they assert legal defenses to prevent government overreach, as Ms. Blackcloud did here.

Most importantly, the offense guideline that applies here, § 2A6.1, is used because the charged offenses related to 18 U.S.C. § 844(e), willfully making a threat or conveying false information about a threat via the internet. Section 844(e) was enacted in 1970 to deal with bomb threats. Title IX of the Organized Crime Control Act of 1970 was passed to strengthen federal laws with respect to the use of explosives. *See* Organized Crime Control Act of 1970, H.R. Rep. No. 91-1549. The House Report says plainly that § 844(e) was only intended to outlaw threats by explosives. The Anti-Arson Act of 1982 amended § 844(e) to add the word "fire." Thus, § 844(e) is now aimed at arson threats and bomb threats, whether the threats are real or fake. In our circuit, § 844(e) has been used to prosecute bomb threats, real or fake but symbolic burnings of one's own property, like the cross burning here, have

9

never been prosecuted under § 844(e). Prosecuting § 844(e) in such a novel way shows that the use of § 2A6.1 is outside of the heartland here.

The gravamen of the offense here, as argued by the government, was not even that the cross burning itself was a "threat by fire" – the government knows it was not a threat - but rather, it was the later dissemination of a video of the cross burning blaming the cross burning on Mobolade's political opponents that was "false information about a threat by fire." The whole thing was a hoax or "false information about a threat." The government's theory was not that the defendants actually meant to threaten Mobolade. Its theory was that they wanted the community to think Mobolade was being threatened to rally voter support. Fake threats, such as fake bomb threats, are threats that can be prosecuted under § 844(e) if they are "true threats" intended to threaten or cause fear, regardless of whether the defendant intends to carry out the bomb threat. But in those cases where there is a fake threat, what is fake about the threat is that there never will be a bomb or an arson. The threat, however, is intended and real even if the bomb or arson is not. What made this cross burning a fake threat was not that the activity, i.e. the cross burning, didn't happen – it did happen. It was a fake threat because it was not intended as a threat but was staged as a political publicity stunt. The § 2A6.1 guideline does not delineate between hoaxes that are meant to be threatening and hoaxes that are not. There is an enhancement under § 2A6.1(b)(1) if there is evidence of an intent to carry out the threat but no decrease if there is not even an intent to threaten, just false information

about a threat. This further takes this case outside of the heartland of § 2A6.1 warranting a downward variance.

In addition, an additional custodial term would be greater than necessary for someone with the characteristics of Ms. Blackcloud considering the § 3553(a) factors. This is Ms. Blackcloud's first felony conviction. A felony conviction is a significant punishment, standing alone, for purposes of the sentencing factors of punishment and general/specific deterrence. Moreover, as a first-time offender convicted of a non-violent offense, imprisonment is discouraged. 28 U.S.C. § 994(j) (Congress instructing the United States Sentencing Commission to set up the guidelines to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first time offender who has not been convicted of a crime of violence or an otherwise serious offense.") Ms. Blackcloud is the primary support for her son. She has already suffered significant adverse employment consequences and personal consequences due to the allegations and felony conviction.

Community confinement is also unnecessary for Ms. Blackcloud, who does not have substance abuse problems, is gainfully and steadily employed and has stable housing. Her strict compliance with bond conditions over the last 13 months and lack of any other convictions since this offense happened over two and one-half years ago address "protection of the public" sentencing considerations and prove that she has the will and ability to comply with conditions imposed by the Court.

As for the need to avoid unwarranted sentencing disparities, co-defendant West was sentenced to probation without any term of incarceration or community confinement. We recognize that co-defendant West did cooperate with the government but otherwise, the evidence suggests that West and Blackcloud had similar roles in the offense. West was very clear that this was Bernard's plan and West did not put really any distance between her own role and Blackcloud's – they were carrying out Bernard's directives together. The five days Ms. Blackcloud spent in jail prior to her release on bond and/or a term of home detention would account for any needed difference between the West and Blackcloud sentences.

As for wanting to avoid disparities in sentencing nationwide, the United States Sentencing Commission statistics show that a 40% to 50% downward variance in this case would be consistent with the national averages. In 2024, 176 cases utilized the §2A6.1 guideline and in 81 of those cases, there was a variance. 2024 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS, United States Sentencing Commission, Table. 32 (2024); *see United States v. Jordan*, No. 14-1377 (10th Cir. Feb. 7, 2017) (variance to 6 months of custody on guidelines of 15 to 21 months under § 2A6.1 due to postings by defendant on Facebook immediately after the Aurora movie theater shootings invoking the Columbine shootings and urging others to join in a mass "KILLING SPREE" in Littleton on a specific date). The mean variance was a 50.7 % decrease, and the median variance was a 42.9% decrease in § 2A6.1 and related

12

Stalking/Harassing cases. *Id.*, Table 40, p. 196 (stating that § 2A6.1 cases fall under the "Stalking/Harassing" category).[2]

WHEREFORE, Ashley Blackcloud asks the Court to find that a sentence that does not involve a further custodial term is sufficient but not greater than necessary for her because she already has 5 days of presentence confinement, has excelled on bond, is respected in her community, has a good work ethic and there are features of her case that make a guideline sentence fall outside of the heartland. She asks the Court to impose a sentence to probation with credit for 5 days of time served or with home detention as a condition.

                                                  Respectfully Submitted,

Dated: January 2, 2026        BRITT M. COBB, LAW OFFICES
                                   Attorney for Defendant Blackcloud

                                     s/    *Britt M. Cobb*

                                   Britt M. Cobb (30099)
                                   3570 E. 12th Avenue, Suite 200, #142
                                   Denver, CO 80206
                                   (303) 351-1628
                                   britt@brittmcobb.com

---

[2] The statistics for "Stalking/Harassing" cases include cases not covered by § 2A6.1  The total number of variances, both upward and downward, for "Stalking/Harassing" cases are 119 (Tables 36 and 40) and as noted, there were variances in 81 cases that utilized § 2A6.1.  87 of the 119 Stalking/Harassing variances were downward at 40%-50% and 32 were upward.